The undersigned have reviewed the prior Opinion and Award based on the record of the proceedings before former Deputy Commissioner Neill Fuleihan and the briefs and oral arguments before the Full Commission. Neither of the parties appealing have shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award.
* * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement dated 13 October 1994 as:
STIPULATIONS
1. On or about the second day of February 1993, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff, Brian M. Spiese and defendant United Parcel Service of America on and prior to 2 February 1993.
3. Defendant, United Parcel Service of America, employed more than three regular employees on and prior to 2 February 1993.
4. Liberty Mutual Insurance Company was the duly qualified workers' compensation carrier on the risk on or about 2 February 1993.
5. Plaintiff's average weekly wage will be computed, in part, by the use of a Form 22 prepared by defendant-employer and submitted to the Commission.
6. Plaintiff submits that the following are issues for determination by the Commission:
 a. Whether allowances given by defendants to plaintiff in the form of monthly payments for group health benefits and employer contributions to the employee's pension fund should be included in a computation of the plaintiff's average weekly wage within the meaning of G.S. § 97-2(5).
 b. Whether defendants' defense of this claim at the original hearing was unreasonable, therefore justifying an award of attorneys' fees in plaintiff's favor pursuant to G.S. § 97-88.1.
 c. Whether plaintiff has synovitis caused by trauma in the employment under the terms of G.S. § 97-53(20).
 d. Whether as a proximate result of plaintiff's occupationally related snyovitis in his knees, plaintiff suffered a partial loss of wage earning capacity within the meaning of G.S. § 97-30.
 e. Whether plaintiff is entitled to payment for past and future medical expenses for his work-related synovitis in accordance with Hyler v. GTE Products Co., 333 N.C. 258, 425 S.E.2d 698
(1993).
 f. Whether defendants should reimburse the North Carolina State Rehabilitation program directly under the provisions of G.S. § 143-547(b)(2) for vocational rehabilitation services previously provided and currently being provided to the plaintiff as a proximate result of his work-related knee injuries.
7. Defendants submit that the following are issues to be determined by the Commission:
 a. Whether plaintiff's underlying preexisting degenerative condition and current symptoms arose separate and apart of his employment with defendant-employer in that his condition and symptoms are not particular to his employment position with defendant employer.
 b. Did plaintiff's diagnosed condition of synovitis result from alleged trauma in his employment pursuant to G.S. § 97-53 or simply arise or exacerbate as a result of his preexisting degenerative condition.
 c. Whether plaintiff accepted and then rejected employment suitable to his capacity pursuant to G.S. § 97-32 in August of 1993 and is therefore due no further compensation benefits.
 d. What benefits, if any, is plaintiff entitled to as a result of his medical diagnosis and treatment and subsequent actions regarding his employment.
8. Exhibits A-P and 1-4 (medical and earnings records) were received into evidence without the need for further authentication or verification.
9. Defendants requested the right to have an independent medical evaluation performed on plaintiff by a doctor chosen by defendants and plaintiff consented to the same on the specific conditions that the evaluation and report were to be completed and a copy of the report provided to the plaintiff no later than 12 November 1994. Furthermore, should a deposition of the then unidentified doctor be necessary, that the deposition would be scheduled and taken by defendants within sixty (60) days of the original hearing before former Deputy Commissioner Fuleihan. Defendants further agreed that if they failed to meet these provisions, they would waive their right to this and any other independent medical evaluations.
* * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the initial hearing before former Deputy Commissioner Fuleihan, plaintiff was a thirty-four (34) year old gentleman who had completed high school.
2. Plaintiff first became employed with United Parcel Service in October of 1987 as a package car driver.
3. Plaintiff initially worked during the overload of the 1987 Christmas season.
4. Plaintiff's first term of employment lasted through Christmas Eve of 1987.
5. In February of 1988 plaintiff was rehired by the defendant as a full time package car driver. Plaintiff's workday averaged nine to nine and one-half hours.
6. Plaintiff, like the other drivers, was assigned a specific geographical area and on the average would make one-hundred and forty to one-hundred and fifty (140-150) deliveries per day. In the afternoon, after the deliveries were completed, he started making pick-ups and would usually make about thirty-five (35) pick-ups on the average day.
7. Each delivery and pick-up would require plaintiff to routinely exit and re-enter a large van which carried the packages.
8. The first step of the UPS delivery truck is approximately nineteen (19) inches high, the second step about nine (9) inches high and the third step is about eight (8) inches high. The steps are constructed of metal.
9. The maximum package size standards when plaintiff was first employed was seventy (70) pounds and a total length, width, and height of one-hundred and thirty (130) inches. That standard has since been substantially increased to one-hundred and fifty (150) pounds and one-hundred and eighty (180) inches in length, width, and height.
10. Plaintiff was able initially to perform his job with no significant physical problems until the peak season of Christmas time in 1990.
11. During the Christmas season plaintiff would sometimes make three-hundred to three-hundred and fifty (300-350) stops. There would be an entrance and exit from the van for each stop. His own personal record was five-hundred and eighty-nine (589) stops in one day.
12. Plaintiff's knees began to give him trouble and he went first to see Dr. Gary Bean at Raleigh Family Physicians. Dr. Bean referred plaintiff to an orthopedic specialist by the name of Dr. Michael Fajgenbaum at the Bone and Joint Clinic in Raleigh, North Carolina.
13. Plaintiff's treatment with Dr. Michael Fajgenbaum began in March of 1991.
14. Dr. Fajgenbaum ruled out rheumatoid arthritis as a cause of plaintiff's knee problems and subsequently began a course of treatment that required plaintiff to undergo three separate knee surgeries.
15. Plaintiff went through routine physical therapy and returned to work after his multiple surgeries.
16. Plaintiff was first informed of the fact that he had a work-related knee condition by Dr. Michael Fajgenbaum on 2 February 1993.
17. Dr. Fajgenbaum is a qualified and duly licensed physician specializing in the field of orthopedic surgery in North Carolina.
18. Dr. Fajgenbaum diagnosed plaintiff as having synovitis of the knees caused by his repeated use of his legs and knees in the performance of his prior duties as a deliveryman for United Parcel Service.
19. Plaintiff filed a claim and notice of accident to the employer initially with the Industrial Commission on 31 March 1993 and later amended said claim and notice to employer on 13 January 1994.
20. Dr. Fajgenbaum recommended that plaintiff discontinue his current job with UPS and not accept a modified job as a mall deliveryman due to the occupational synovitis in his knees.
21. The modified mall job offered by UPS was a job that plaintiff had performed before.
22. The difference between the Crabtree Mall job and regular route was that the number of entrances and exits out of the truck was decreased to perhaps seventy (70) times thirty (30) stops per day.
23. However, there were approximately one-hundred and eighty (180) stores in Crabtree Valley Mall and plaintiff would have been required to service from one-hundred and ten to one-hundred and twenty (110-120) stores per day.
24. This job would require continuous standing and walking for nine and one-half hours per day while carrying packages weighing up to one-hundred and fifty (150) pounds on a flat handcart.
25. The surfaces of Crabtree Valley Mall are mostly concrete.
26. Dr. Fajgenbaum recommended that plaintiff not accept the mall job because the performance of his job duties would aggravate the synovitis in plaintiff's knee joints.
27. Plaintiff last physically worked for UPS on 24 March 1993.
28. Since working for UPS, plaintiff, at various times, supplemented his family income by delivering newspapers for the Raleigh News and Observer and working at a temporary job with Manpower.
29. Plaintiff's ability to earn wages was diminished as a direct and proximate result of the knee injury he sustained while working as a package car driver with the defendants.
30. After 1 July 1993 plaintiff took a part-time job with the Raleigh News and Observer delivering newspapers and later went to work with Manpower in an additional part-time position.
31. The combination of these two part-time jobs permitted plaintiff to earn $176.69 per week from that point forward.
32. Plaintiff voluntarily quit these two part-time jobs on 11 September 1994 for reasons not related to his job-related knee injuries and therefore plaintiff is ascribed earnings at $176.69 until such time as he is re-employed after completing his vocational rehabilitation and occupational therapy training.
33. Plaintiff went to the State Division of Vocational Rehabilitation Services in September of 1993 and started a program of rehabilitation to become an occupational therapy assistant.
34. At the time of the hearing plaintiff was enrolled at Wake Technical School for the prerequisite courses and scheduled to attend Durham Technical College to finish his training for the occupational therapy field.
35. Plaintiff is unable to return to his former or the modified mall job with defendant-employer because of his job-related knee disease.
36. Plaintiff, after completing his current vocational rehabilitation program, will be able to perform the physical duties of an occupational therapy assistant.
37. Plaintiff's average weekly regular wage was $740.55.
38. In addition to plaintiff's regular wages, he was paid by defendants in the form of periodic contributions to his group medical coverage and plaintiff's retirement fund. ($176.50 per week for both contributions).
39. Plaintiff received short term disability benefits from defendants in the amount of $173.08 per week from 23 March 1993 to 20 September 1993.
40. Defendants' defense of this claim was based in reason rather than in stubborn, unfounded litigiousness.
* * * * * * * * * * * * *
Based on the foregoing findings of fact the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a direct and proximate result of plaintiff's repetitive work with defendant-employer and the resulting trauma to plaintiff's knees, plaintiff developed a compensable occupational disease known as synovitis of the knee joints. G.S. § 97-53(20).
2. As a direct and proximate result of plaintiff's occupational disease, synovitis of the knees, plaintiff has experienced a partial loss of wage earning capacity from and after 2 February 1993. G.S. § 97-30.
3. Plaintiff's claim and notice to defendant-employer of the occupational disease was timely filed. G.S. § 97-22; G.S. § 97-58(c).
4. Plaintiff is entitled to temporary partial disability in weekly compensation payments equal to 66 and two-thirds (66 2/3) percent of the difference between his average weekly wage before the injury and the average weekly wages which he is able to earn thereafter, but not more than the amount established annually as provided by G.S. § 97-29 and in no case shall the period covered by such compensation be greater than 300 weeks from 2 February 1993. G.S. § 97-30.
5. The maximum weekly compensation rate effective at the time of plaintiff's injury was $442.00 per week. G.S. § 97-29.
6. Plaintiff is entitled to past and future medical coverage for his work-related occupational disease as long as such treatment is reasonably required for a relief from the occupational condition without any time limitation and without demonstrating a change of condition. Hyler v. GTE Products Co.,333 N.C. 258, 425 S.E.2d 698 (1993); Little v. Penn VentilatorCo., 317 N.C. 206, 345 S.E.2d 204 (1986); Smith v. American EfirdMills, 305 N.C. 507, 290 S.E.2d 634 (1982).
7. An employee's disability resulting from an occupational disease described in G.S. § 97-53 is treated as the happening of an injury by accident within the meaning of the North Carolina Workers' Compensation Act. G.S. § 97-52.
8. Defendants shall reimburse the North Carolina State Division of Vocational Rehabilitation Services for all sums expended or incurred for medical and vocational services to the plaintiff during his current rehabilitation program. G.S. § 143-547; G.S. § 97-25.5.
9. Periodic payments made by defendants for plaintiff's group medical coverage and retirement fund during the fifty-two (52) week period preceding his injury do not constitute an allowance of any character within the meaning of G.S. § 97-2(5) and should not be included in calculation of the plaintiff's average weekly wage.
10. Plaintiff's average weekly wage based upon his regular wages and excluding contributions made by defendants for medical and retirement benefits was $740.55. G.S. § 97-2(5).
11. Defendants provided plaintiff contributions for health benefits and plaintiff's pension in the amount of $176.50 per week.
12. From 23 March 1993 through 20 September 1993, plaintiff received short-term disability benefits from a solely employer funded plan averaging $173.08 per week for which defendants are entitled to a credit. G.S. § 97-2(9); G.S. § 97-42.
13. From and after 1 July 1993 plaintiff had earnings averaging $176.69 derived from a part-time job as a newspaper deliveryman and a temporary employment service. G.S. § 97-2(9).
14. Considering plaintiff's above referenced earnings, his current compensation rate is $375.91 per week. G.S. § 97-30.
15. Inasmuch as defendants' defense of this claim was based in reason rather than in stubborn, unfounded litigiousness, plaintiff's attorney is not entitled to attorney's fee pursuant to G.S. § 97-88.1.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay to plaintiff partial disability benefits from and after 2 February 1993 at a rate of $375.91 per week for a period not to exceed three-hundred (300) weeks from 2 February 1993, subject to adjustment based upon any change in plaintiff's earnings and subject to a credit to defendants for disability benefits paid from 23 March 1993 to 20 September 1993.
2. Such compensation as has accrued shall be paid in a lump sum without commutation, subject to a reasonable attorney's fee hereinafter approved.
3. Defendants shall pay all medical compensation incurred by the plaintiff as a result of his compensable occupational disease.
4. Defendants shall reimburse the North Carolina State Division of Vocational Rehabilitation Services for all medical or vocational costs expended by said state agency as a part of plaintiff's rehabilitation program in which he is currently enrolled.
5. A reasonable attorney's fee of twenty-five (25) percent of the compensation due under this Award is hereby approved for plaintiff's counsel which shall be deducted from same Award and forwarded directly to Mr. R. Edwin McClearen. For the balance of this fee, defendants shall forward every fourth compensation check payable to plaintiff's counsel.
6. Defendants shall pay the costs, including expert witness fees in the amount of $500.00 to Dr. Lyman Smith and $225.00 to Dr. Michael Fajgenbaum.
 S/ ________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ________________________ DIANNE C. SELLERS COMMISSIONER
S/ ________________________ COY M. VANCE COMMISSIONER